(127 So. 506)

## VAN HEUVEL v. ROBERTS.
### I Div. 549.

Supreme Court of Alabama.
March 13, 1930.

Rehearing Denied April 17, 1930.

Stevens, McCorvey, McLeod, Goode & Turner, of Mobile, for appellant.

Harry T. Smith & Caffey and Outlaw & Kilborn, all of Mobile, for appellee.

86

## THOMAS, J.

This litigation is the result of the charge that appellant overreached his coadventurer in their final settlement and distribution of the proceeds and profits accruing to them from the sale of certain real property located in the state of Florida.

It is admitted that the parties were mutually interested in the ratios indicated; that the benefits were to be obtained and equally divided; but the trial court held that, by reason of the manipulations of appellant, who deceived or overreached appellee, the former unduly received an amount in excess of the latter.

■ The relations and duties, respective and mutual, of the parties as coadventurers are well understood in this jurisdiction, as those in fiduciary and confidential relation, as that of partners, principal and agent, and trustee and cestui que trustent, etc., as to being "bound by the uberrima fides of the relation." Saunders v. McDonough, 191 Ala. 119, 67 So. 591; Enslen v. Allen, 160 Ala. 529, 49 So. 430; Goldsmith v. Eichold Bros. & Weiss, 94 Ala. 119, 10 So. 80, 33 Am. St. Rep. 97; Bestor v. Barker, 106 Ala. 240, 250, 17 So. 389; Powell v. Wilson, 219 Ala. 645, 123 So. 38, 43; Verner v. Mosely (Ala. Sup.) 127 So. 527;[1] Dikis v. Likis, 187 Ala. 218, 221, 65 So. 398; and general authorities 12 C. J. p. 421; 33 C. J. p. 851, note 83; Lindley on Partnership (Ewell's) vol. 2, p. 775; 30 Cyc. 458 (6). The utmost good faith and fairness in the prosecution of the common enterprise are exacted, and it is forbidden that there be accrual of profits, benefits, or advantages therein to one of the members or coadventurers which are not shared by his associates. The one acts for and by

the other, is subject to its disadvantages, and equally partakes of its benefits. Winsett v. Winsett, 203 Ala. 373, 376, 83 So. 117.

Courts are careful not to fetter this useful jurisdiction in such matters by defining the exact limits of its exercise. In this connection Lord Chelmsford observes that, wherever two persons stand in such a relation to each other that, while it continues, confidence is necessarily reposed by one, and the "influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed." Tate v. Williamson, L. R. 2 Chancery Appeal Cases (1866–67) pp. 55, 61; Roby v. Colehour, 135 Ill. 300, 337, 25 N. E. 777; Holt v. Agnew, 67 Ala. 360, 369, 370. See, also, 1 Story, Eq. §§ 239, 251.

The statement of the rule upon which the courts act is: "When a party, by the force of circumstances, is reduced to a condition in which he cannot deal upon terms of equality with another, and [by reason of such circumstances, we interpolate] is peculiarly subject to oppression, or imposition, or to undue influence." Holt v. Agnew, supra. This rule is well expressed by Judge Story in volume 1, Eq. §§ 239, 251. Under such relations or circumstances, neither party can support any profit, benefit, or advantage obtained by reason thereof or therefrom, over the other party. Saunders v. McDonough, supra; Id., 218 Ala. 207, 118 So. 389; Id., 201 Ala. 321, 78 So. 160; Id., 210 Ala. 208, 97 So. 622; Pennsylvania Fire Ins. Co. v. Malone, 217 Ala. 168, 172, 115 So. 156, 56 A. L. R. 1075. The foregoing rule not only applies to the party occupying and acting in confidential relation, but to all who were associated with him. Verner v. Mosely ante, p. 36, 127 So. 527.

The application of the rule found early expression in Zimmerman v. Huber, 29 Ala. 379, where one partner purchased their properties at auction sale on account of the insurers of the damaged property, and it was held the benefits of the purchase inured to the firm, and not to the purchasing party individually. To like effect are McKinley v. Irvine, 13 Ala. 681, and Smith v. McGehee, 14 Ala. 404. In 2 C. J. 694, the authorities are collected as to "Individual or Adverse Interests in General," and the reason for and application of the rule is that it was adopted and applied "on the ground of public policy, in order to remove from the agent all temptation to neglect," fraud, or overreach, etc., "his principal's interest." Peters Mineral Land Co. v. Hooper, 208 Ala. 324, 327 (4), 94 So. 606.

■■ There is another proposition that may be adverted to: When an agent in the conduct

[1] Ante, p. 36.

of his principal's business obtains benefit, profit, or advantage over a third party, the transaction is voidable at the election of the third party; the agent is responsible and must account to the principal for that benefit, profit, or advantage. When this is done, the principal may ratify, except when not in contravention of public reason and public policy (13 C. J. 506, §§ 452, 453), and assume the obligation and benefit, subject to the voidable action of the third party having likewise an election as to the transaction. Any other rule would subject the principal to liabilities, damages, costs, and still deprive that principal of the resulting or compensating benefits and the necessities on which to exercise this right of election, and would give the offending or unfaithful agent the reward of his wrongdoing. Ratification is not binding without a full knowledge of the facts and material circumstances attending the act to be ratified. Story's Agency, § 239; 2 C. J. p. 470, § 83, page 517, § 138; 13 C. J. 506; Herring, Farrell & Sherman v. Skaggs, 73 Ala. 446, 455; Huntsville Belt Line & Monte Sano R. Co. v. Corpening & Co., 97 Ala. 681, 687, 12 So. 295; Gibson v. Snow Hardware Co., 94 Ala. 346, 10 So. 304; Evans v. Daughtry, 84 Ala. 68, 4 So. 592; Steinhardt v. Ball, 80 Ala. 208.

It is further established by this court that a settlement between parties, coadventurers, and other parties in interest, will be reopened on timely and proper application, for a just and true settlement, when it is averred and shown that the one party has defrauded, overreached, or taken "undue advantage" of the other in the accomplishment of the settlement. Hallman v. Brock, 204 Ala. 17, 19, 85 So. 280; Paulling v. Creagh's Adm'rs, 54 Ala. 646; Scheuer v. Berringer, 102 Ala. 216, 14 So. 640; Burks v. Parker, 192 Ala. 250, 68 So. 271. See, also, Enslen v. Allen, 160 Ala. 529, 49 So. 430; Peters Mineral Land Co. v. Hooper, 208 Ala. 324, 94 So. 606; Saunders v. McDonough, supra; 47 C. J. 1187, 1188.

The material facts entering into the two controverted items in which the trial court decreed in favor of appellee-complainant may be stated, in short, as follows:

A Mr. Turner and a Mr. Vaughn were employed by the coadventurers, the instant parties to this suit, to assist in carrying out the sale of said real property, and for a consideration of $10,000 to each of said third parties. They were each paid $2,500, and, when the time came for a final distribution, $7,500 in notes of the new purchasers (McGowin-Foshee Lumber Company) were delivered into the hands of Mr. Roberts, complainant, to be paid to Mr. Vaughn, and these notes were delivered by complainant to Mr. Vaughn in accordance with the understanding between the coadventurers. Of these notes of the McGowin-Foshee Lumber Company. $7,500 were in like manner turned over to Mr. Van Heuvel, respondent, to be delivered to Mr. Turner in payment of the balance due him by the coadventurers. Instead of carrying out this trust with Roberts, Van Heuvel proceeded to settle with Turner for $2,500 of these notes and to appropriate the other $5,000 to his own use. This much is admitted by all in the pleadings.

Turner testified that Van Heuvel induced him to accept $2,500 in settlement of the $7,500 obligation, by misrepresenting the facts. According to Turner's testimony, he was deceived. Witness further testified:

"He wired me to meet him, under date of July 17, 1924, which telegram has been introduced in evidence as exhibit No. 7 to my deposition. When I met Mr. Van Heuvel in Jacksonville, he paid me five thousand dollars, in two checks, one being for one thousand dollars and one for four thousand dollars. He never did tell me that he had received twenty five hundred dollars in cash and seventy five hundred dollars in notes, and he never offered to pay seventy five hundred dollars in notes and twenty five hundred dollars in cash to me. I did not know that he had any such notes for me. He never at any time informed me that ten thousand dollars had been set aside out of the purchase price and delivered to him to be paid over to me, in any form. On the contrary he insisted that he was being greatly handicapped and injured by having to personally arrange to take care of me to the extent of five thousand dollars, and if I did not take that I would not get anything. He never offered to buy the notes mentioned in the interrogatory from me, nor did I know they were in existence. I did not know he held such notes when I settled with him for five thousand dollars, if I had I certainly would not have settled on that basis. The only reason I settled with him was that I was convinced from what he said that if I did not settle with him right then and there on his terms I would get nothing; and I especially stressed the fact that in accepting five thousand dollars it was not a settlement in full, and that I would require him to pay the other five thousand dollars. Still he said I would not be able to get it, and I told him, 'You will owe it to me until it is paid.' * * * He demanded a receipt in full in payment of the five thousand dollars, and told me I would be compelled to give him a receipt in full for that amount if I got anything. * * *

"I have made repeated efforts to have him pay the balance of the ten thousand dollars, in person, over the telephone and by letter, and he would always bring up the fact that Mr. Roberts had beaten him out of large sums of money already, and that he did not make anything in the deal, and there was no way to compensate me further."

Roberts' evidence accords with Turner's as to what settlement should have been paid. Van Heuvel, on the contrary, states the facts

and relations of the parties, and his dealing with Turner, as follows:

"The remainder of the notes were distributed by giving to Roberts and myself as follows:

| Martin Van Heuvel. | I. T. Roberts. |
|---|---|
| $ 1,666.66 | $ 1,666.66 |
| 9,076.24 | 9,076.24 |
| 7,411.07 | 1,411.07 |
| 25,000.00 | 25,000.00 |

"Roberts then took the Vaughn notes, he said to me: 'Now you take the Turner notes and we will each make the best trade we can with them, as they haven't done much.' As a matter of fact Vaughn did very little, besides drive his car and Turner did nothing except to suggest McGowin Foshee Lumber Company as a possible purchaser. Turner was getting very anxious to get some cash out of the deal if it was going through. He wrote me, and wired me at Mobile that he preferred taking five thousand ($5,000.00) dollars in cash for his interest. I wired him at Gainsville, Florida, asking him to come to Mobile. He answered my wire and I will attach the original telegrams from him (copies of mine) which were exchanged between us. This correspondence is marked Exhibit ———. On July 18, 1924, I arrived at Jacksonville where Mr. Turner was waiting for me. He was very glad to see me and we were not long in trading. I bought his notes and check for five thousand ($5,000.00) dollars, and I gave him New York exchange checks one for one thousand ($1,000.00) and one for four thousand ($4,000.00) dollars, and I took a receipt for payment in full."

Thus he asserts and attempts to justify his right to retain the other $5,000, which he claims the right to appropriate as legitimate profits from the transaction in which he was interested with Roberts.

■ The circuit court held that Mr. Van Heuvel had been guilty of fraud in connection with this item, and ordered him to surrender to Roberts one of the two notes of the McGowin-Foshée Lumber Company which had been turned over to him to be delivered to Mr. Turner, but which he had retained under his agreement with Mr. Turner, or else to account for the proceeds thereof. In this judgment we concur, after a careful examination of the record.

The second item in dispute, and which the trial court decided with complainant, arose in this way: The timber on the Florida lands was first sold to the W. C. Wood Lumber Company for certain considerations, including a number of notes which the W. C. Wood Lumber Company issued and which were so divided that Van Heuvel and Roberts each received notes for the same amount that belonged to them in the joint adventure. Roberts received two Wood notes for $5,000 each, which he hypothecated to a bank in Florida (according to the bill and answer), and which notes were sold under foreclosure of a pledge to a third person, V. W. Helms. This purchaser was anxious to dispose of these notes for about 60 per cent. of their face value— a fact known to Van Heuvel, but not to his partner or coadventurer, Roberts. In this Van Heuvel found an opportunity to obtain an advantage over his coadventurer, Roberts, or in which the partner was not to participate. In order to accomplish this, he arranged with the gentleman who had purchased this note at foreclosure sale to sell it to him at discount, 60 per cent. of its face value, with the understanding that the note would be delivered upon the receipt of a telegram. Van Heuvel testified that he purchased this note for $6,000, on the 17th day of July, 1924, from Mr. V. W. Helms of Miami, Fla., and turned it over to the party indicated in exchange for two notes for $5,000 each on the same day that he says that he purchased it from Mr. Helms of Miami, Fla. Mr. Stevens confirms the fact that Van Heuvel surrendered the note to him two days after the settlement, which latter event, or date thereof, was on July 15, 1924. Mr. Stevens said:

"You ask me the following question: 'When did you first learn that before that arrangement was made and before that letter was written Mr. Van Heuvel had arranged with the holder of that note to purchase it for much less than its face value and that he would telegraph to send the notes forward as soon as he got this arrangement closed?' In answer to that question I say that I never learned of that arrangement at all. I never knew that Van Heuvel had arranged to purchase the note or was arranging to purchase the note at all until about two or three days after the closing of this transaction, after July 15th when Van Heuvel came in and brought me for exchange under the arrangement set forth in this letter that we have just been talking about, that note and I think other notes which he had and I then learned that in the notes which he handed me was this $10,000.00 Roberts note which up to that time I had thought was held somewhere in Florida."

■ Miami is about two days travel from Mobile, so Van Heuvel could not have made the purchase in Miami on the 17th of July, 1924, and obtained the note for surrender to Mr. Stevens in Mobile on the same day, except by reason of the fact that said notes had been sent to Mobile to be delivered by some one to Van Heuvel (provided Van Heuvel elected to make the purchase); and Van Heuvel could not have communicated his election on said 17th of July and delivered the notes to Mr. Stevens on the 17th, except by closing the transaction by wire. We judicially know that Miami and Mobile are distant points in two contiguous states. Ameri-

can *Automobile Ins. Co.* v. *Carson*, 212 Ala. 293, 102 So. 219. So much for the physical facts of location and distance as affected by the dates stated, those of purchase, settlement, and delivery of the notes.

Van Heuvel explains that he had correspondence with Mr. Helms, and it had been agreed that Helms would sell him the note for $6,000, and that Helms had sent the note with draft attached to a bank in Mobile, Ala., and, that he took up the draft on July 16, 1924.

It will be observed that the notes in question had been sent to Mobile with the draft attached, prior to date of settlement, July 15th, as otherwise the draft could not have been taken up in Mobile on July 17th. It is further manifest from the statement that he purchased it on July 17th, that he could not have exercised his option to purchase on that date except by telegram.

Van Heuvel thereupon took up the matter of the distribution, and a letter of instructions addressed to the McGowin-Foshee Lumber Company was prepared for the joint signatures of Van Heuvel and Roberts, under which was made the whole distribution of proceeds as affecting the joint adventurers. In the meantime, Van Heuvel had communicated with Mr. Roberts, and in a conversation at the Battle House it had been agreed between them that they should each enjoy an equal benefit in the distribution. Van Heuvel himself so testified as follows:

"I spent considerable time with I. T. Roberts in his room at the Battle House in Mobile, and we agreed. Roberts was to share equally with me in the settlement in both the cash and in the notes, according to our conversation in the above mentioned meeting at the Battle House in Mobile. At that time Roberts was to pay all of his attorneys fees and a few days before the final settlement was made, Roberts called me over to his room at the Battle House, and tried to hold up the deal unless I helped him pay his attorney fees in addition to all I had agreed to give him. I finally agreed to allow him twenty five hundred dollars on his attorneys fees, and four thousand dollars cash was paid on account thereof out of the general fund, one half, therefore naturally came out of my share. The remaining five hundred dollars I kept back to take care of his share of the Trustee's fee which we and the McGowin-Foshee Lumber company agreed should be the Merchants Bank of Mobile, Trust Department. They agreed that the cost would be two hundred dollars a year, but not to exceed one thousand dollars for the entire time it would run. These things were all agreed to by Roberts when he was sober."

Van Heuvel, however, arranged, for the purpose of carrying out the agreement for equal division, to draft a letter of instructions addressed to the McGowin-Foshee Lumber Company, directing them as to the method of distributing the purchase price and notes to be given by the McGowin-Foshee Lumber Company, in which it was provided that certain notes of that company for $10,000, which should be charged against Roberts as a part of his distributive share, should nevertheless be retained in the hands of the McGowin-Foshee Lumber Company to be delivered to "the holder" of the Wood notes of equal value upon the surrender of the Wood notes. It will be observed throughout that, while this, as a letter, was to the purchasers, the agent and attorney thereof handled the matter to see that his principal had clear title by distribution of the purchase money. The letter appears in the report of the case.

Roberts understood the expression "the holder" as referring to the party to whom the respective notes had been distributed. He testified that, according to the understanding between the parties, the notes were left in Mobile in trust, or, as they expressed it, in escrow, for the purpose of enabling the respective parties to get together and present the Wood notes that had been distributed to them, respectively, for exchange for an equal amount of the notes of the new purchaser. The appellee produced and offered in evidence, a memorandum of the fact that this note had been left with the McGowin-Foshee Lumber Company in escrow. When or after the aforementioned letter for distribution was signed, Van Heuvel closed for the purchase of said note at 60 cents on the dollar, and then turned it in to the holder and distributor of the notes, and there were delivered to him notes of the new purchasers equal to the face value thereof. In this transaction, without the knowledge or consent of Roberts, Van Heuvel obtained an advantage of $4,000 over his co-adventurer, Roberts. The testimony of Van Heuvel shows this, as he concludes his evidence saying:

"As heretofore stated there was no $5,000.00 notes distributed from the sale of the timber to the W. C. Wood Lumber Company. I did buy from one V. W. Helms on July 17th, 1924, a note for $10,000.00 that at one time did belong to I. T. Roberts. After purchasing it I handed it over to T. M. Stevens for which I got in exchange two notes for $5,000.00 each of the McGowin Foshee Lumber Company."

The settlement between Roberts and Van Heuvel occurred in Mobile July 15, 1924, and Mr. Van Heuvel testified that the owner of the note had agreed to sell it to him for $6,000, and that he sent the note with the draft attached to one of the banks in Mobile, and that he (Van Heuvel) took up the draft on July 16, 1924. He explained as to this:

"The note had been endorsed by I. T. Roberts. I signed the document. Mr. Whitacker then asked me if I would buy the note, and

if so, to make a bid for it. I told him I was not in a position to buy it, but that I might be interested in it later. He said that he represented Mr. V. W. Helms, and that he would write to Mr. Helms immediately to get in touch with me. I did not hear from Helms for some time, but later he wired me offering me the note for a price of eight thousand ($8,000.00) dollars. We corresponded for some time and finally he agreed to sell it to me for six thousand ($6,000.00) dollars. He sent the note with a draft attached to one of the banks in Mobile, Alabama, and I took up the draft on July 16, 1924."

We have indicated that Van Heuvel testified that he purchased the note in Miami, Fla., on July 17th; he said further that, after purchasing the note, he turned it over to the party disbursing the funds and distributing notes for which he got in exchange the two notes of $5,000 each of the McGowin-Foshee Lumber Company; these being the same notes that had been charged against Roberts in the distribution. These notes had been retained by the disbursing agency or authority under the letter of instructions to the McGowin-Foshee Lumber Company to the effect that these two notes were to be exchanged with "the holder" of the $10,000 Wood note; and these notes had previously been distributed to Roberts, which he had hypothecated in Florida. This letter of instructions had been signed on July 15th, as shown by the testimony of Mr. Stevens; and Mr. Van Heuvel came into his office in Mobile two or three days after closing the transaction and brought him the $10,000 note in question, which he then and there exchanged for the two $5,000 notes of the McGowin-Foshee Lumber Company which had been set apart as a part of Roberts' distributive share.

We have indicated that this settlement was on July 15th, in Mobile, Ala., and Van Heuvel testified that he purchased the $10,000 note in question on July 17th in Miami, Fla., and that the note arrived in Mobile attached to a draft which was handled through the bank, in time to enable coadventurer, Van Heuvel, to take up the drafts on the 16th or 17th of July, and to turn them in to Stevens not later than the 18th. These facts fully support the theory on which appellee relies and on which the trial court held, that when Van Heuvel purchased this note which had been distributed to Roberts (and which had been lost by him by reason of the foreclosure of the pledge), *he made the purchase for the benefit of the joint enterprise;* and at that time he was required to account therefor just as he would have been bound to account for any other purchase which he might have made in the conduct of the joint enterprise. He was not within the rule announced in Peters Mineral Land Co. v. Hooper, 208 Ala. 324, 94 So. 606, where there was a termination of the trust and relation of agency.

It is unnecessary to discuss the evidence. The record has been carefully examined, and the decree of the lower court in all respects is affirmed. That court had the right, under the evidence and reasonable discretions allowed by the statute, to make disposition of costs as was done.

Affirmed.

ANDERSON, C. J., and SAYRE, and BROWN, JJ., concur.