Rel: December 22, 2022

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2022-2023

_____

### 1210334
_____

### Sunitha Rani Madasu

### v.

### Shoals Radiology Associates, P.C.

### Appeal from Lauderdale Circuit Court
### (CV-17-900333)

MITCHELL, Justice.

The doctrine of respondeat superior holds employers vicariously liable for the torts of their employees in certain circumstances. The

question in this appeal is whether one physicians' group can be vicariously liable for an act its employee took while he was working for a different physicians' group, simply because his work for the second group conferred an incidental benefit on the first group. Under our precedents, the answer to that question is no. We therefore affirm the judgment of the trial court.

Facts and Procedural History

On April 22, 2016, Sunitha Rani Madasu checked herself into the emergency room at Eliza Coffee Medical Center ("ECMC"), complaining of a severe headache, nausea, and vomiting. The emergency-room physician ordered a CT scan of her head, which allegedly showed multiple blood clots. But the radiologist on duty at ECMC, Dr. Donald Bowling, did not notice the clots and reported that the scan was normal. Three days later, Madasu suffered a severe seizure that left her partially paralyzed.

Madasu brought this suit in the Lauderdale Circuit Court, alleging that Dr. Bowling had negligently misinterpreted her CT scan and that, if not for his negligence, her seizure could have been prevented. She also sued the two physicians' groups for which Dr. Bowling worked in 2016,

2

Shoals Radiology Associates, P.C. ("Shoals"), and Lauderdale Radiology Group, LLP ("Lauderdale"), claiming that, under the doctrine of respondeat superior, those groups were vicariously liable for his negligent interpretation.

After the close of discovery, both Shoals and Lauderdale moved for summary judgment as to Madasu's respondeat superior claims. Shoals admitted that Dr. Bowling was its employee in April 2016, but it argued that there was no evidence that he was working for Shoals at the time he examined Madasu's CT scan. Lauderdale, on the other hand, admitted that Madasu was working for it when he examined the scan, but it argued that he was working as an independent contractor rather than as an employee.

The undisputed summary-judgment evidence showed the following. During the period relevant to this case, Dr. Bowling worked for two physicians' groups: Shoals and Lauderdale. Dr. Bowling was a full-time employee of Shoals. Shoals had an exclusive contract with Shoals Hospital ("SH"), which provided that Shoals was the only physicians' group authorized to provide radiology services at SH and that Shoals's physicians could not work at any other hospital without SH's express

3

written approval. Shoals did not have a business or professional relationship with ECMC and had never directed its physicians (including Dr. Bowling) to treat patients at ECMC.

ECMC, meanwhile, had an exclusive agreement with a different physicians' group: Lauderdale. That agreement barred Lauderdale from providing radiology services at other hospitals and likewise barred ECMC from obtaining radiology services from any other physicians' group.

While he was employed by Shoals, Dr. Bowling entered into an oral agreement to moonlight for Lauderdale at ECMC. Lauderdale scheduled Dr. Bowling's shifts at ECMC on an as-needed basis, paying him by the hour. Lauderdale was the only entity that paid Dr. Bowling for the work he performed at ECMC; Shoals never paid him for that work.

Dr. Bowling's work with Lauderdale arguably violated the terms of his written employment contract with Shoals, which prohibited Dr. Bowling from working for any other physicians' group while Shoals employed him. The employment contract also stated that any fees earned by Dr. Bowling from the practice of medicine belonged exclusively to Shoals. There was never a written amendment to those contract

4

provisions. Dr. Bowling and Shoals's administrator, Michael Roberts, testified that there had been an oral amendment -- which, they said, allowed Dr. Bowling to moonlight for Lauderdale on his own time and to keep the money he earned from doing so -- but Madasu characterizes that testimony as "self-serving" and argues that it cannot be credited at the summary-judgment stage. Madasu's brief at 58. In any event, it is undisputed that Shoals never received or attempted to recover payment for the work Dr. Bowling performed for Lauderdale.

After reviewing the evidence in the record, the trial court denied Lauderdale's summary-judgment motion, explaining that there were unresolved material disputes of fact bearing on whether Dr. Bowling worked for Lauderdale as an employee or as an independent contractor. But it granted Shoals's summary-judgment motion, holding that Madasu had failed to present substantial evidence that Dr. Bowling was working for Shoals when he treated Madasu at ECMC. The trial court certified that judgment as final under Rule 54(b), Ala. R. Civ. P. Madasu appealed.[1]

---

[1]Dr. Bowling and Lauderdale are not parties to this appeal. Nothing in this opinion should be construed as expressing a view on the

Standard of Review

We review de novo a trial court's order granting a motion for summary judgment, applying the same standard as the trial court. Howard v. Cullman Cnty., 198 So. 3d 478, 482 (Ala. 2015). Specifically, we ask whether the movant (here, Shoals) has shown that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. Ala. R. Civ. P. 56(c). In making such a determination, we give the nonmovant (here, Madasu) the benefit of all reasonable inferences from the evidence, but not purely speculative or conjectural inferences in her favor. Howard, 198 So. 3d at 482; Warren v. Hooper, 984 So. 2d 1118, 1123 (Ala. 2007). Once the movant makes a prima facie showing that there is no genuine dispute of material fact, the burden shifts to the nonmovant to produce substantial evidence that such a dispute exists. Aliant Bank, a Div. of USAmeribank v. Four Star Invs., Inc., 244 So. 3d 896, 907 (Ala. 2017). Ultimately, if the nonmovant "'"fails to make a showing sufficient to establish the existence of an

---

merits of Madasu's claims against Dr. Bowling and Lauderdale, including the question whether Dr. Bowling worked for Lauderdale as an employee or as an independent contractor.

element essential to that party's case, and on which that party will bear the burden of proof at trial,"'" then "'"Rule 56(c) mandates the entry of summary judgment"'" against that party. Ex parte General Motors Corp., 769 So. 2d 903, 907 (Ala. 1999) (citations omitted).

Analysis

Madasu argues that, under the doctrine of respondeat superior, an employer is liable for an employee's acts whenever those acts were undertaken "either '(1) "in the line and scope of his employment" or (2) "in furtherance of the business of [the employer]."'" Madasu's brief at 49 (citations omitted). Madasu does not argue that Dr. Bowling was acting "in the line and scope of his employment" with Shoals while he was working for Lauderdale; if anything, she appears to concede that he was not. See Madasu's reply brief at 1. But she argues that she can satisfy the furtherance-of-business test because, she says, Dr. Bowling's work for Lauderdale conferred a benefit on Shoals. Specifically, she points out that Dr. Bowling's employment contract with Shoals gave Shoals the right to all fees earned by Dr. Bowling in the practice of medicine -- including, presumably, the fees Lauderdale paid him. And although she concedes that Shoals never exercised that right, she maintains that the

contract nonetheless gives Shoals a "chose in action" -- that is, a right to sue Dr. Bowling to recover the money he earned from Lauderdale -- and that this right constitutes a legal "benefit" to Shoals sufficient to trigger respondeat superior liability.[2] Madasu's brief at 53.

At the outset, some clarification is in order regarding the scope of respondeat superior liability. The doctrine of respondeat superior holds employers "'vicariously liable for acts of [their] employee[s] that were done for the employer[s'] benefit'" in certain circumstances. Cobbs, Allen & Hall, Inc. v. EPIC Holdings, Inc., 335 So. 3d 1115, 1138 (Ala. 2021) ("Cobbs") (quoting Potts v. BE & K Constr. Co., 604 So. 2d 398, 400 (Ala. 1992)). The doctrine does not, however, hold employers liable for acts impelled by an employee's "motives that had nothing to do with [the employee's] duties" to his employer. Cobbs, 335 So. 3d at 1140. That is

---

[2]Madasu also contends that Shoals can be vicariously liable for any negligent act Dr. Bowling performed at ECMC because ECMC advertised Dr. Bowling on its website and that, as a result of that advertisement, Shoals "benefited from Dr. Bowling's relationship with [ECMC]." Madasu's brief at 54. That theory is not properly before us because Madasu never presented it to the trial court. See Rogers Found. Repair, Inc. v. Powell, 748 So. 2d 869, 872 (Ala. 1999) ("[A]ppellate courts will not reverse a trial court on any ground not presented to the trial court.").

true even if the employee's independent pursuits happened to confer an unintended or incidental benefit on his employer.  East Alabama Behav. Med., P.C. v. Chancey, 883 So. 2d 162, 168 (Ala. 2003) ("East Alabama").

We explained last year that an employer is vicariously liable under the doctrine of respondeat superior for the wrongful acts of its employee when (1) "'"the [employee]'s wrongful acts were in the line and scope of his employment"'"  or (2) "'"the acts were in furtherance of the business of [the employer]."'"  Cobbs, 335 So. 3d at 1138 (citations omitted).  Even if we assume, as Madasu urges, that those two aspects of our respondeat superior analysis represent distinct avenues for establishing liability,[3]

---

[3]The Court of Civil Appeals has inferred from our occasional use of the word "or" that these two aspects represent distinct tests, each of which is independently sufficient for establishing liability.  See SouthTrust Bank v. Jones, Morrison, Womack & Dearing, P.C., 939 So. 2d 885, 905 (Ala. Civ. App. 2005).  Although we reserve judgment on that question -- which we need not resolve here -- we note that many of our cases, including Cobbs itself, have described the furtherance-of-business inquiry as a component of the line-and-scope test, rather than as a separate basis for vicarious liability.  See, e.g., Cobbs, 335 So. 3d at 1139 ("'"'The rule ... for determining whether certain conduct of an employee is within the line and scope of his employment is substantially that if an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of the employment, is deemed by law to be an act done within the scope of the employment.'"'" (citations omitted) (emphasis added)); Hulbert v. State Farm Mut. Auto. Ins. Co., 723 So. 2d

both avenues require, at a minimum, that the employee acted with an intention to serve "'"the master's business,"'" rather than acting on wholly independent motives. East Alabama, 883 So. 2d at 168 (citations omitted).

That is because the furtherance-of-business test is a subjective test, not an objective one. When courts ask whether an employee acted to "benefit his employer" for purposes of respondeat superior, we are asking whether the employee possessed the "intention to perform" the action "as a part of or incident to a service on account of which he [wa]s employed." 1 Restatement (Second) of Agency § 235 (Am. L. Inst. 1958). The mere fact that an employee's independently motivated action happened to "result in an incidental benefit to the employer" is not enough to trigger respondeat superior liability. Brooks v. Bobby Kitchens, Inc., 536 So. 2d

---

22, 23 (Ala. 1998) ("An act is within an employee's scope of employment if the act is done as part of the duties the employee was hired to perform or if the act confers a benefit on his employer."); Doe v. Swift, 570 So. 2d 1209, 1211 (Ala. 1990) (describing the "furtherance of the employment" language as an "aspect of the [line-and-scope] test"). Leading treatises take a similar approach. See, e.g., 1 Restatement (Second) of Agency § 235 (Am. L. Inst. 1958); Stuart M. Speiser et al., The American Law of Torts § 4:3 (Lawyers Coop. Publ'g Co. 1983).

81, 82 (Ala. Civ. App. 1988); accord East Alabama, 883 So. 2d at 168 (explaining that a tort committed by an agent, "'even if committed while engaged in the employment of the principal,'" cannot be attributed to the principal if it emanated from a wholly independent or personal motive (citation omitted)).

With that clarification in mind, we agree with the trial court that Madasu's claim against Shoals cannot proceed. Nothing in the record before us suggests that Dr. Bowling intended to benefit Shoals while he was working for Lauderdale. Indeed, the undisputed evidence strongly supports the opposite conclusion: during his shifts for Lauderdale, Dr. Bowling was not being paid by Shoals, was not on the clock with Shoals, was not treating Shoals's patients or serving Shoals's clients, was not working with or under the direction of any of Shoals's employees or agents, and was not working on Shoals's property or at any Shoals-affiliated facility. The undisputed evidence further reveals that Dr. Bowling never remitted to Shoals any portion of the money Lauderdale paid him for the work he performed at ECMC, and that both Dr. Bowling and Shoals believed that Shoals was not entitled to that money.

Even if we accept Madasu's argument that Shoals obtained a "benefit" from Dr. Bowling's work for Lauderdale by virtue of Shoals's (never exercised) contractual right to sue him for fees earned from that work, Madasu provides no reason to think that this benefit was anything other than an incidental benefit that was unintended by Dr. Bowling. When an employee is performing duties assigned to him by one employer and not another, the most reasonable assumption is generally that the employee intends to act only for the benefit of the employer for whom he is working at the time. See Cobbs, 335 So. 3d at 1140. That assumption can, of course, be overcome by contrary evidence,[4] but only if that contrary evidence is reflected in the record. Madasu does not point to any such evidence here.

The closest she comes to doing so is when she posits that there may have been an unspoken "gentleman's agreement" between Shoals and Lauderdale to allow each group's physicians to cover one another's shifts at their respective hospitals and that Dr. Bowling may have worked for

---

[4]See Sea Calm Shipping Co. v. Cooks, 565 So. 2d 212, 215 (Ala. 1990) ("[I]t is settled that an agent can be employed by two principals contemporaneously.").

Lauderdale to help Shoals uphold its end of that shift-coverage agreement. But that is speculation; nothing in the record supports it. In fact, the evidence before us suggests that the opposite is true: Lauderdale's physicians and Shoals's administrator testified without contradiction that Lauderdale had never covered or agreed to cover any shifts for Shoals.[5]

Madasu argues that a reasonable jury would not have to believe those witnesses and that, accordingly, a jury could conclude that a shift-coverage agreement did, in fact, exist. Madasu's premise is correct -- it

---

[5]Madasu emphasizes that one of Lauderdale's physicians, Dr. Norman, said during his deposition that he "believe[d]" that he had clinical privileges at a long list of hospitals in 2016, one of which was SH. But during that same deposition, Dr. Norman also said that Lauderdale's "relationship with [SH] has been sort of on and off over the years" and that he could not remember "with any certainty" what that relationship was like in 2016. Dr. Norman later reviewed his records and submitted an affidavit stating that he did not perform any work at SH during the period when Shoals had an exclusive relationship with that hospital. Madasu argues that Dr. Norman's statements contradict each other and that a reasonable jury could credit the first statement and not the second. We disagree. The deposition transcript makes clear that Dr. Norman simply could not remember details about Lauderdale's relationship with SH in 2016. When Dr. Norman later examined his records and refreshed his recollection, he stated that he was certain that he had not worked any shifts at SH that year. The two statements are consistent, and no reasonable jury could conclude from reviewing them that Dr. Norman had "admitted" to covering shifts for Shoals at SH.

is true that a jury would not have to believe these or any witnesses -- but her conclusion does not follow. It was Madasu's responsibility as plaintiff to put forward substantial evidence in support of her theory that Shoals and Lauderdale had a shift-coverage agreement that impelled Dr. Bowling to work for Shoals's benefit while he was working for Lauderdale. When witness testimony is the only evidence in the record on a particular point, disbelief of that testimony "is not proof that the opposite of the witness's statements is true." Estate of Logan v. City of S. Bend, 50 F.4th 614, 615 (7th Cir. 2022). Rather, "disbelief would mean that the record is empty, and on an empty record, the plaintiff loses, because the plaintiff has the burdens of production and persuasion." Id. (collecting cases); accord General Motors, 769 So. 2d at 907 (noting that "'a moving party in the position of [the defendants] need not prove a negative to prevail on a motion for a summary judgment'" (citation omitted)). It is possible that all the witnesses are lying and that Lauderdale and Shoals really did have a secret shift-coverage agreement. But a plaintiff at the summary-judgment stage must do more than raise the mere possibility that the facts could favor her. See Howard, 198 So.3d at 482. She must put forward evidence from which a reasonable trier of

14

fact could conclude that it is <u>more likely than not</u> that the facts favor her. <u>See</u> <u>id.</u>

Madasu has not met that burden here. Nothing in the record before us would enable a reasonable jury to conclude that Dr. Bowling's "<u>work for [one employer]</u>" was undertaken in furtherance of duties he "was hired to perform <u>for [a different employer]</u>." <u>Cobbs</u>, 335 So. 3d at 1139. The trial court was therefore correct to hold that Shoals is entitled to summary judgment.

AFFIRMED.

Parker, C.J., and Bolin, Shaw, and Wise, JJ., concur.

Bryan, Sellers, Mendheim, and Stewart, JJ., concur in the result.